UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| QUANARDEL WELLS, ) | |
| ) | |
| Mr. Wells, ) | |
| ) | |
| v. ) | No. 1:19-cv-01943-JMS-MJD |
| ) | |
| P. TALBOT, et al. ) | |
| ) | |
| Defendants. ) | |

**ENTRY GRANTING MEDICAL DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

For the reasons explained in this Entry, the motion for summary judgment filed by defendants Michelle LaFlower, Dr. Paul Talbot, and Wexford of Indiana, LLC (Wexford) (the Medical Defendants), dkt. [37], is **granted.**

**I. Background**

Plaintiff Quanardel Wells is a prisoner confined at all relevant times at the Pendleton Correctional Facility (Pendleton). He brings this 42 U.S.C. § 1983 civil rights action against the Medical Defendants in addition to other defendants. He alleges that he has nerve damage in his face and cannot use a disposable or straight razor because it will cause nerve pain. He cannot let his hair grow because the longer the hair becomes the more painful it is. He alleges that Ms. LaFlower and Dr. Talbot have refused to comply with a physician's order for medication and to use an electric beard trimmer on his face. He also alleges that Wexford hired Dr. Talbot knowing he is an unfit physician and would perform in a way to save money. Dkt. 8 at 2-3 (Entry Screening Complaint).

1

The Medical Defendants seek resolution of the claims against them through summary judgment. Dkt. [37]. Mr. Wells responded, dkt. [49-51], and the Medical Defendants replied, dkt. [52]. The motion is ripe for resolution.

## II. Summary Judgment Standard

Summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Material facts are those that might affect the outcome of the suit under applicable substantive law." *Dawson v. Brown*, 803 F.3d 829, 833 (7th Cir. 2015) (internal quotation omitted). "A genuine dispute as to any material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Daugherty v. Page*, 906 F.3d 606, 609-10 (7th Cir. 2018) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). The Court views the facts in the light most favorable to the non-moving party and all reasonable inferences are drawn in the non-movant's favor. *Barbera v. Pearson Educ., Inc.,* 906 F.3d 621, 628 (7th Cir. 2018). The Court cannot weigh evidence or make credibility determinations on summary judgment because those tasks are left to the fact-finder. *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018).

## III. Discussion

### A. Undisputed Facts

The following statement of facts was evaluated pursuant to the standards set forth above. That is, this statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to Mr. Wells as the non-moving party with respect to the motion for summary judgment. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

Mr. Wells was transferred from Wabash Valley Correctional Facility (WVCF) to Pendleton on August 8, 2018. Dkt. 2 at 5. Prior to Mr. Wells' transfer to Pendleton, he was seen at WVCF for complaints of musculoskeletal pain in his neck and left upper arm caused both by a dog bite and a laryngocele surgery. Dkt. 39-1 at ¶¶ 3, 5. A laryngocele is an uncommon medical condition which entails the dilation of the laryngeal saccule. *Id.* at ¶ 6.

Mr. Wells was also diagnosed with sleep apnea and Gastroesophageal Reflux Disease (GERD). A patient diagnosed with sleep apnea experiences repeated stopping and starting of breathing during sleep. *Id.* at ¶ 16. The first-line of treatment for this condition is weight loss. *Id.* The second-line of treatment is the provision of a Continuous Positive Airway Pressure (CPAP) machine. *Id.* This machine uses a hose and mask to deliver constant steady air pressure to the patient during sleep. *Id.* Mr. Wells received a CPAP machine on July 16, 2018. *Id.* at ¶ 22.

Dr. Talbot first treated Mr. Wells at Pendleton on August 24, 2018, at which time Mr. Wells reported that he had access to his CPAP machine. Dkt. 39-12 at ¶ 8. Given that Mr. Wells was started on Cymbalta for neuropathic pain at his prior facility, Dr. Talbot continued that order for continuity of care. *Id.* Given Mr. Wells' body mass index (BMI), Dr. Talbot strongly encouraged Mr. Wells to lose weight to manage his sleep apnea, breathing difficulties, and GERD. *Id.*

On August 28, 2018, Mr. Wells was sent off-site for a follow-up visit with Dr. Anthony, an Indiana University Ear, Nose, and Throat specialist who previously treated Mr. Wells for his laryngocele. *Id.* at ¶ 9. Dr. Anthony recommended three things: a beard trimmer (rather than shaving with a razor after his neck surgery), a wedge pillow to help with severe reflux disease, and Famotidine (a/k/a Pepcid) for Mr. Wells' GERD. *Id.* at ¶ 9; dkt. 39-14. Dr. Talbot made a notation on the paperwork that, per custody staff, Mr. Wells was not permitted to possess beard trimmers

3

in his cell. Dkt. 39-12 at ¶ 9; dkt. 39-14 at 4. Dr. Talbot noted on August 31, 2018, that Mr. Wells could be seen by the prison barber for his shaving needs. *Id.*

The decision to not allow Mr. Wells to have electric clippers in his cell was made by custody staff, not by Dr. Talbot. Dkt. 39-12 at ¶ 16. Dr. Talbot had no authority to override custody's decision to not permit offenders to possess electric clippers in their personal property. *Id.* at ¶ 20. But, Mr. Wells was permitted to go to the prison barber shop to shave with electric clippers. *Id.* at ¶ 16.

As the on-site medical provider at Pendleton, Dr. Talbot had no control over facility lockdowns or the barber shop. *Id.* at ¶¶ 17-18. Further, Dr. Talbot could not force custody staff to transport offenders to certain areas, including the barber shop, during facility lockdowns. *Id.* at ¶ 17.

Mr. Wells has been a licensed barber since 1990. Dkt. 39-26 at 11:8-9, 24-25, 12:1, 22-23. (Deposition Transcript of Mr. Wells). Mr. Wells is currently a Pendleton staff barber. *Id.* at 12:25, 13:1-2. Mr. Wells began working in the barber shop at Pendleton in October or November 2018. *Id.* at 28:16-21. Prior to working in the staff barber shop, Mr. Wells worked as a barber in the offender barber shop at Pendleton. *Id.* at 13:4-6. Prior to working in the offender barber shop, Mr. Wells volunteered at the barber shop in order to receive a shave. *Id.* at 70: 14-17. Mr. Wells works Monday through Friday, and is also called maybe twice a month to work on the weekends. *Id.* at 13:24-25, 14:1-6. Mr. Wells did not need a shave pass once he began working in barber shop because he can shave himself with electric clippers when he works. *Id.* at 28:14--25, 29:1-2, 66:9-21. Mr. Wells has been shaved at times once or twice a week, but prefers to shave himself every other day to minimize pain. *Id.* at 53:5-9, 66:2-8.

Since gaining access to the offender barbershop in October or November 2018, Mr. Wells

4

only experienced difficulty receiving shaves while housed in G cell house and during facility lockdowns. *Id.* at 52:13-22; 59:6-14. Even while in G cell house, Mr. Wells had a medical shave pass. *Id.* at 72:9-11. Mr. Wells received weekly medical shaves during his time in G cell house. *Id.* at 72:12-22. During facility lockdowns, offenders cannot be shaved because the barbers themselves are locked down. *Id.* at 59: 24-25, 60:1-20.

Dr. Talbot next treated Mr. Wells on January 22, 2019. Dkt. 39-12 at ¶ 13; dkt. 39-16. The purpose of this visit was to evaluate Mr. Wells for a potential infection. *Id.* Mr. Wells had a borderline temperature, some swelling, and left ear pain. *Id.* Dr. Talbot concluded that he had left ear and upper respiratory infections. *Id.* Accordingly, Dr. Talbot prescribed antibiotics, ordered labs to monitor Mr. Wells' overall functioning, and ordered Mr. Wells to return in two weeks to assess the efficacy of the treatment. *Id.*

The third time Dr. Talbot saw Mr. Wells was two weeks later, on February 5, 2019. Dkt. 39-12 at ¶ 15; dkt. 39-18. In addition to following up with Mr. Wells for his infections, Dr. Talbot also evaluated Mr. Wells for GERD, obesity, and sleep apnea. *Id.* Mr. Wells reported that his ear infection had resolved. *Id.* Although Mr. Wells had lost some weight, he was still obese according to his BMI. *Id.* Dr. Talbot again counseled Mr. Wells on his need to lose weight to manage his GERD and sleep apnea. *Id.* Mr. Wells also indicated that he had access to his CPAP machine and that it was helping his sleep apnea. *Id.* Dr. Talbot renewed Mr. Wells' Pepcid order. *Id.*

Dr. Talbot has worked for Wexford on two separate occasions. Dkt. 39-12 at ¶ 19.) The first period of time was from 2010 to 2014 in Illinois. *Id.* Dr. Talbot then moved from Illinois to Indiana in 2014 and began to work for Corizon Health, LLC, which had the medical contract with the Indiana Department of Correction (IDOC). *Id.* Then, when Wexford took over the contract on April 1, 2017, Dr. Talbot began his second term of employment with Wexford. Dr. Talbot worked

at Pendleton from 2014 until November 2019, when he transferred to a different IDOC facility. *Id.*

Michelle LaFlower was at all relevant times the Health Services Administrator (HSA) at Pendleton. Dkt. 39-19 at ¶ 1. Mr. Wells first submitted a Request for Interview to Ms. LaFlower regarding his medical care on October 22, 2018. *Id.* at ¶ 5; dkt. 39-20. In this correspondence, Mr. Wells said he wanted to speak with her because he was in pain and "can't seem to get any help medically no matter how many grievances I file…." *Id.* Ms. LaFlower asked him to specify his issue so she could investigate. *Id.*

Mr. Wells was seen by Nurse Practitioner (NP) Purdue twice in October 2018. Dkt. 39-12 at ¶¶ 10-11. During these encounters, Mr. Wells complained that his wedge pillow was too small. Although NP Purdue requested a larger wedge pillow and a formulary exception request for Neurontin, both requests were denied by the Regional Medical Director. *Id.* at ¶ 11-12. Mr. Wells was still prescribed Cymbalta at the time of these visits. *Id.* at ¶ 11. Mr. Wells was advised to lose weight by restricting his commissary purchases and exercising. *Id.* at ¶ 12; dkt. 39-15. He was also advised to place his coat under his mattress to wedge the mattress up. *Id.* NP Purdue further relayed to Mr. Wells that a larger wedge pillow creates a concern following laryngocele surgery, as it could increase the intraabdominal pressure and cause more pain. *Id.*

On November 15, 2018, Mr. Wells submitted a Request for Interview to Ms. LaFlower, saying that he had not received his proper pain medication, proper wedge pillow, or CPAP machine since he arrived at the facility. Dkt. 39-19 at ¶ 6; dkt. 39-21. The Director of Nursing at the time, Carrie Stephens, responded by saying that the request for a larger wedge pillow was not approved and that he had reported that he had access to his CPAP machine on August 24, 2018, and that if his machine had been removed, it was a custody matter because medical did not have it. *Id.* She also informed him that his medication orders were current. *Id.*

Whenever Ms. LaFlower responded to Request for Interview forms or formal grievances, she would review the patient's recent medical records to review the care the patient had received. Dkt. 39-19 at ¶ 7. Mr. Wells next submitted a Request for Interview form on November 20, 2018, complaining that because his wedge pillow could not fit in the travel box he was not allowed to bring it to Pendleton. *Id.* at ¶ 9; dkt 39-22. Ms. LaFlower responded that if custody had confiscated Mr. Wells' pillow then he would have to go through custody to replace it. *Id.* As the HSA, Ms. LaFlower had no authority to force custody to return property because the reason for confiscation was typically a matter of facility safety and security. Dkt. 39-19 at ¶ 9.

From August to November 2018, Mr. Wells was prescribed Cymbalta, Pepcid, Sucralfate, Docusate Sodium, and received water refills for his CPAP machine. *Id.* at ¶ 10; dkt. 39-23. Mr. Wells was permitted to retrieve all his medications, with the exception of Cymbalta, periodically (monthly, bi-monthly) and was allowed to keep them on his person or in his cell. Dkt. 39-19 at ¶ 10.

As the HSA, Ms. LaFlower did not have the ability to change or direct a patient's course of treatment. *Id.* at ¶ 13. She also did not have the ability to diagnose patients or to prescribe a certain medication. *Id.* Her job was more administrative than clinical. *Id.*

**B. Analysis**

Mr. Wells was a convicted prisoner at all relevant times. This means that the Eighth Amendment applies to his deliberate indifference claims. *Estate of Clark v. Walker*, 865 F.3d 544, 546, n.1 (7th Cir. 2017) ("the Eighth Amendment applies to convicted prisoners"). To prevail on an Eighth Amendment deliberate indifference claim, Mr. Wells must demonstrate two elements: (1) he suffered from an objectively serious medical condition; and (2) the defendant knew about Mr. Wells' condition and the substantial risk of harm it posed but disregarded that risk. *Farmer v.*

*Brennan*, 511 U.S. 825, 837 (1994); *Walker v. Wexford Health Sources, Inc.*, 940 F.3d 954, 964 (7th Cir. 2019); *Petties v. Carter,* 836 F.3d 722, 728 (7th Cir. 2016); *Pittman ex rel. Hamilton v. Cty. of Madison, Ill.*, 746 F.3d 766, 775 (7th Cir. 2014); *Arnett v. Webster,* 658 F.3d 742, 750-51 (7th Cir. 2011). "[A]n inmate is not entitled to demand specific care and is not entitled to the best care possible…." *Arnett,* 658 F.3d at 754. Rather, inmates are entitled to "reasonable measures to meet a substantial risk of serious harm." *Id.*

"A medical condition is objectively serious if a physician has diagnosed it as requiring treatment, or the need for treatment would be obvious to a layperson." *Pyles v. Fahim,* 771 F.3d 403, 409 (7th Cir. 2014). The "subjective standard requires more than negligence and it approaches intentional wrongdoing." *Holloway v. Del. Cty. Sheriff*, 700 F.3d 1063, 1073 (7th Cir. 2012).

For purposes of the motion for summary judgment, the Medical Defendants concede that Mr. Wells had objectively serious medical conditions consisting of his laryngocele surgical wound, sleep apnea, and upper extremity neuropathic pain. Dkt. 43 at 17.

**Claims Against Dr. Talbot**

In his response to the motion for summary judgment, Mr. Wells stipulates that the only material facts he disputes "due to newly enacted policies" of Pendleton are paragraphs #20 and #37. Dkt. 50 at 2. Paragraph 20 states in its entirety that:

> Plaintiff was sent off-site for a follow-up visit with Dr. Anthony on August 28, 2018. Dr. Anthony recommended three things: a beard trimmer, a wedge pillow, and Famotidine (a/k/a Pepcid) for Plaintiff's GERD. Dr. Talbot made a notation on the paperwork pertaining to GERD that, per custody, Plaintiff was not permitted to possess beard trimmers in his cell. Therefore, Dr. Talbot noted on August 31, 2018 that Plaintiff could be seen by the prison barber for his shaving needs.

Dkt. 43 at 7 (internal citations omitted).

Paragraph 37 states, "Dr. Talbot had no authority to override custody's decision to not permit offenders to possess electric clippers in their personal property." Dkt. 43 at 12.

8

Mr. Wells argues that Dr. Talbot was deliberately indifferent to Dr. Anthony's order for a beard trimmer, ordered because of Mr. Wells' inability to shave with a razor after his neck surgery. *See* dkt. 39-14 at 1. As noted, Mr. Wells disputes Dr. Talbot's testimony that he could not override custody's decision to not allow Mr. Wells to possess his electric clippers in his cell, dkt. 43 at ¶ 37; dkt. 50 at 2, but Mr. Wells has presented no evidence to the contrary.

Mr. Wells' affidavit asserts that he had a conversation with state defendants Davis and Alsip in May 2020, during which they told him that there was no current policy against inmates possessing electric clippers in their cells, but that in August of 2018, Davis sporadically confiscated clippers and it was Mr. Wells' "unlucky day" when his were taken. Dkt. 51 at ¶¶ 2-3. The Medical Defendants question the veracity, admissibility, and relevance of Mr. Wells' alleged conversation with defendants Alsip and Davis, but even if these alleged statements are taken as true, they confirm that custody staff confiscated Mr. Wells' clippers. Moreover, even though Dr. Talbot was aware that Mr. Wells was not allowed to keep electric clippers in his cell, Dr. Talbot provided a medical pass for Mr. Wells to go to the barber shop to be shaved.

Dr. Anthony recommended that Mr. Wells shave with a beard trimmer or electric clippers. He did not prescribe that Mr. Wells have access to a beard trimmer or electric clippers in his cell. Dr. Talbot was aware that Mr. Wells had a reasonable alternative to using a razor, *i.e.,* being shaved by the prison barber. Even if Dr. Talbot had misunderstood the policy regarding possession of electric clippers in cells, of which there is no evidence, that would still not constitute deliberate indifference on his part. Dr. Talbot did not ignore or thwart the recommendation that Mr. Wells be allowed to use electric clippers rather than a razor.

To the extent Mr. Wells argues in his response that Pendleton changed its policy regarding inmates' possession of electric clippers, this would have no bearing on his claims against the

9

Medical Defendants. Further, to the extent he argues there was a "conspiracy" to violate his constitutional rights, no conspiracy claim was allowed to proceed in this action. *See* dkt. 8 (Screening Entry).

Although Mr. Wells would have preferred to have the electric clippers in his cell, he is not entitled to demand them. *Arnett,* 658 F.3d at 754. He was provided other means to have periodic shaves. If he was unable to get a shave in the barber shop as often as he wanted due to his housing or lockdown circumstances, Dr. Talbot, as a medical provider, had no control over that. Moreover, Mr. Wells works every weekday in the barber shop where he can use electric clippers. He only needed a shave pass for a few months when he first arrived at Pendleton. None of these circumstances create a genuine issue of fact regarding whether Dr. Talbot was deliberately indifferent to Mr. Wells' post neck surgery care.

To the extent Mr. Wells alleged in his complaint that Dr. Talbot refused to provide him pain medication, no facts relating to the pain medication prescribed by Dr. Talbot have been disputed. There is no evidence that Dr. Talbot refused to continue the pain medications that were prescribed.

Therefore, no reasonable jury could find that Dr. Talbot was deliberately indifferent to any of Mr. Wells' serious medical conditions.

**Claim Against Ms. LaFlower**

In his complaint, Mr. Wells alleges that HSA LaFlower refused to resolve issues he was having with his medical conditions. In his response to the motion for summary judgment, Mr. Wells' single paragraph stating that Ms. LaFlower was deliberately indifferent "by furthering the conspiracy of Talbot, Davis, and Alsip to Wells' serious medical needs" is insufficient to create a genuine issue of fact. Dkt. 50 at 6. He argues that "LaFlower failed to provide a reasonable course

of treatment for Wells' medical conditions…." *Id.*

The undisputed record demonstrates that Ms. LaFlower was not a medical provider. When she did receive requests or grievances, she or others reviewed Mr. Wells' medical records and provided an appropriate response. She reviewed his medications and noted that they were all current. With respect to his complaint about his wedge pillow, she explained that he would have to go through custody staff if they had confiscated it. Mr. Wells had also been informed by NP Purdue that there was a concern with a large wedge pillow because it could increase abdominal pressure and cause more pain. There is no evidence that Ms. LaFlower knowingly turned a blind eye to any inappropriate or harmful treatment by Dr. Talbot or other providers. *See e.g., Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) ("Although a medical care system requires nurses to defer to treating physicians' instructions and orders in most situations, that deference may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient."). As a member of the administrative staff, Ms. LaFlower could defer to the medical providers' judgment as long as she was responsive to Mr. Wells. *Id.* at 440 ("As a nonmedical administrator, Peterman was entitled to defer to the judgment of jail health professionals so long as he did not ignore [the inmate plaintiff].") Ms. LaFlower did not have the authority to direct the course of treatment for any inmate. Therefore, no reasonable jury could find that she was deliberately indifferent to Mr. Wells' serious medical needs.

### Claim Against Wexford

Mr. Wells has presented no admissible evidence of an unconstitutional policy or custom on the part of Wexford. More specifically, he has presented no evidence supporting his theory that Wexford hired Dr. Talbot knowing he would not provide proper care as a means of saving money. Indeed, he failed to respond to the motion for summary judgment with respect to any claim against

11

Wexford. He does not dispute any of the material facts presented by Wexford. Accordingly, Wexford is entitled to judgment as a matter of law.

### IV. Conclusion

For the reasons discussed above, the motion for summary judgment filed by defendants Talbot, LaFlower, and Wexford, dkt. [37], is **granted.** No final judgment shall issue at this time because claims against other defendants remain pending.

The Magistrate Judge is requested to set this matter for a status conference to direct the further development of the remaining claims.

**IT IS SO ORDERED.**

Date: 1/29/2021

Hon. Jane Magnus-Stinson, Chief Judge
United States District Court
Southern District of Indiana

Distribution:

QUANARDEL WELLS
881139
PENDLETON - CF
PENDLETON CORRECTIONAL FACILITY
Electronic Service Participant – Court Only

All electronically registered counsel

Magistrate Judge Mark D. Dinsmore